Our second case is 24-1491, Somerville v. Union Carbide Corporation. Mr. Autry, whenever you're ready. Thank you, Your Honor. Josh Autry, good morning. I represent the plaintiffs. One brief anecdote that I'll eat my time with for a few seconds. Years ago in law school, I had the pleasure of seeing the Fourth Circuit hold argument at Washington and Lee. I've been in several circuits since then, and I still appreciate the collegial aspect of the Fourth Circuit. And I'm glad to be here for the first time. I hope you feel that way after we're done. We'll see, Your Honor. Your Honor, often federal courts in diversity cases are called to make eerie guesses. In this case, the court exercised an eerie veto. Unfortunately, the district court looked at West Virginia's choice for allowing a medical monitoring action without a physical injury and decided that that was a bad policy decision. This court ultimately concluded, based upon its review of law reviews and competing jurisdictions that have made different policy choices, that West Virginia was wrong, that this is not an actionable injury, and the court below adopted the dissent from the West Virginia Supreme Court in its conclusion as what the law should be in West Virginia. The district court erred in several ways in making this analysis on standing. First, it is simply not true that every damages decision is a standing decision. Damages involves injuries, sure. And we needed a damages expert, true. There are plenty of cases, frequently cases, where the plaintiffs need damages experts in order to meet their burden of proof. But that does not mean that if the jury rejects the damages testimony at trial, that the court never had standing and that the court never had jurisdiction to hear the case. Often, plaintiffs have to prove that their damages experts are reliable. But that does not mean that if they lose their Daubert motion, that the court never had jurisdiction over the case to begin with. So I would like to look at the standing decision first. So go right to that elephant in the room that you brought at the beginning, the district court's perspective in terms of what is an injury. And I guess by definition in medical monitoring cases, there is no actual injury. I guess that's true, right? You don't know. You're testing constantly to see if it's there. And the question then becomes, you know, you seem to allude, you don't need an injury in order to have article 3 standing. Is that your position? No, I disagree with that, Your Honor. What is the injury? So the injury, as recognized by the West Virginia Supreme Court, is the invasion of the legally protected privacy interest, which is having to breathe or drink polluted air or water, depending on the type of case, and the current need for a medical monitoring. That costs money. And that is what we are seeking in this case. The district court has previously recognized this precise principle in the Rhodes decision and in the LaTarte decision by the Southern District of West Virginia, which was the same district judge . . . You have to establish via an expert the level at which the breathing of whatever that toxic substance is would cause an injury. In other words, you would . . . I guess in theory, there's some amount you could breathe in. We all breathe in toxins all day long. But then there's a level of which you take in that could cause an injury. Would the expert have to establish that under the scientific principles of making sure that the methodology and the reliability is there as the district court seemed to have been? In this case, yes, Your Honor. We did need an expert testimony. Our evidence was not subject to lay understanding or comprehension without expert testimony. Maybe there is a possible theoretical case where you would not need expert testimony and lay testimony could get you there. This is not that case. So we did need an expert to meet our causation and damages elements here. Can I ask you . . . you cited two West Virginia cases that you say the district court went against. Did those two cases predate trans-union? They did, Your Honor, but I'll go straight to trans-union. Trans-union, we don't believe, changed the analysis whatsoever. Trans-union talked about the issue of whether you had an error on a credit report that never went out and whether there was any harm from that. The plaintiffs in trans-union did not allege any present injury. So they didn't allege any need for a monitoring system that was going to cost them money. They also did not allege any invasion of a legally protected privacy interest that the West Virginia Supreme Court has recognized here under the restatement second, section 7-1. And that's also the restatement section that the southern district of West Virginia, same district judge, previously cited in the Rhodes and LaTarte decisions when it was citing the common law acceptance of the ability to have a medical monitoring cause of action. Trans-union was a game-changer. I mean, it's a game-changer in terms of what the Supreme Court did in that case. Don't you agree? I disagree, Your Honor. The Supreme Court was citing Lyons. It was citing its prior cases. It was recognizing the same principles that it had recognized for decades. The Supreme Court did not, for example, overturn Duke Energy, which we cite in our brief, which talked about the same invasion of a privacy interest or of your protected interest for people that live next to a polluting nuclear power plant. The Supreme Court said that is a clear and present, or a direct and present, current injury. So we're not even talking about an imminent injury here. We are saying we have a present injury, as the Supreme Court has found, as this court has found in Gaston Copper. This court found on an en banc decision that that is a legitimate standing decision. So someone who swims in a river that is being polluted four miles away, that person has a present injury, whether they have a current manifestation or not. That is a current injury that is actionable. So it sounds like you wouldn't take issue with this quote from TransUnion, but tell me if you think it's incorrect, given the context of this case. So the quote is, The mere risk of future harm standing alone cannot qualify as a concrete harm to seek damages, at least unless the exposure to the risk of future harm itself causes a separate concrete harm. So if I'm understanding you, you're suggesting that this case is entirely on all fours with that statement. Correct. We are alleging a present, current injury. And what is that injury? The injury is the invasion of the privacy interest having to breathe polluted air by a factory next door. This is a present injury of needing to establish a medical monitoring system because they have given you a cancer risk that is not known to the general public. So you need medical tests that cost money that people 40 miles away don't need. It's because they polluted your air that you are breathing, just like the people in the Duke Energy case, the 40 residents that live next to the nuclear facility. The Supreme Court said that is a direct and present injury. It's different from someone who needs credit monitoring because of a data breach that others who are not subject to that breach don't need. Your Honor, I believe you're referencing this court's Beck decision, which I believe is the only prior decision by this court which has addressed current cost. And this court in Beck in footnote 5 said that the decision was different because it's not an environmental case. This court could not obviously overrule Gaston Copper in Beck, which was an en banc decision. And this court distinguished Gaston Copper in Beck by saying that the standard is different in environmental cases where you, because you're drinking polluted water or you're breathing polluted air or you're swimming in a polluted river, you have a direct injury at that moment that is actionable and that it is a low bar for pollution cases, for environmental cases under the Supreme Court precedent and under this court's precedent, including the en banc decision in Gaston Copper. And again, even if TransUnion did change the game, I believe the district court overstepped and applied the wrong standard. The district court cites law review articles for basically saying that medical monitoring shouldn't exist as a cause of action. And the district court decided that as a policy matter that the West Virginia Supreme Court was wrong. Standing or no, the district court was citing the dissent in the Bauer decision by the West Virginia Supreme Court in a 4-1 decision, saying that the West Virginia Supreme Court got it wrong and that the West Virginia Supreme Court should have deferred to the state legislature. So even if we, okay, we'll go with the medical monitoring cases, cognizable in terms of Article 3 standing, the district court excluded your key expert here. And without that expert, which you say you need one, you would say you cannot advance on this claim because without that expert, you're just not able to meet the first prong there. And in this instance, the basis upon which the district court excluded this testimony went to questions of reliability and examine the evidence, the various evidentiary positions that were put forth, the fact that there was some collaboration in terms of maybe with the institute, another entity. They couldn't really tell what the basis was for his opinion, which is what Rule 702 requires, which is kind of a sweeping rule. When you read that comment on it, it seems like it was talking about me a lot when it was talking about cases, courts have done this, and it said it did it incorrectly. I didn't do that, but I'm just saying. But there's a lot of that in that commentary in terms of what goes to weight and what goes to admissibility. But the district court seemed to have done, I would say, whether it's correct or not, it was pretty thorough, went through this and really articulated the basis upon which it was saying that this expert's opinion was not adequately supported such to make it reliable and within the scientific methodology that's required to allow this opinion to go forward. That's really a key part to this case here is to what extent does the expert testimony here not meet the standards. Your Honor, I wish the district court had went to that comment that you're talking about. The district court applied a very different standard. Citing law review articles that basically said that error models should not be allowed in federal court, the district court applied a standard of certainty or uncertainty. The district court applied a standard of precision. Four times in the district court's opinion it said that models are uncertain. Once it said that it needs certainty. Twice it said it needs precision. That is not the standard under 702 as amended. The 702 amendments say that the standard is whether it is more likely or not reliable, not whether it is certain. It says that the jury can decide which expert to credit when you have a disagreement between the experts. The standard is not correctness. Federal judges are not supposed to, quote, nitpick under the new amendments. It also said that the expert does not have to give . . . I'm sorry to interrupt, but doesn't the requirement of assuring a reliable foundation suggest at least some inquiry into the basis for the opinions? I don't necessarily disagree with you that the district court had some well-entrenched views about a great many things involving this case. In the end, you seem to go through the foundations for your experts' conclusions and decided that essentially it was garbage in, garbage out. Why isn't that a problem for you? Because the district court was wrong on each of those points and the district court credited the defense interpretation of the evidence over ours. Let's start with the 1984 issue. In 1984, the Union Carbine submitted regulatory reports that said this is what the emissions are. Union Carbine, sorry, had a different argument a couple of months ago. Union Carbine then said two years later that we actually think we overestimated. And the district court said incorrectly that that was a statement at the time of submission. It was a statement two years later. The district court said that twice. The district court faulted our expert for not crediting that. But our expert looked into that and said it was a conclusory statement two years later that was not based on anything. It was a two-paragraph letter that did not mention ethylene oxide. It said that it did not say what they did to create a different result. And they also did not seek to amend the regulatory submission. So in order to submit your regulatory emissions, you evaluate each process and what you're doing at the facility. The defendant or the appellee here did not reproduce that analysis and tell the regulatory agency what was wrong there. They didn't withdraw and replace it. And also they made statements that were incorrect. So in the submission they said that anything that was not leaking at 10,000 parts per million was not a leak. Well, our expert said that's just not true. You can leak down to 200 parts per million. So they were ignoring small leaks, which when you talk about fugitive emissions is actually really important because you're talking about aggregate leaks over the course of the facility, every flange, every pipe connector. And those add up. And so the issue is, did our expert have a reliable basis for choosing to disregard the defendant's explanation or discrediting of its own analysis two years later and choose to use that information anyway? Can I ask you, before you sit down, a specific question about one of the assumptions your expert relied on? And you can correct me if I've got this wrong. But I understood that among the assumptions that he made for some of these years was based on data that the company submitted to the regulators that required them to estimate the maximum amount of emissions over a given number of years. And he used that to suggest that was sort of the baseline on which to form his conclusions. Now, first of all, is that correct? No. So if it were correct, that would be a problem, right? If it were correct, it would be a problem. But it's incorrect. So the district court didn't even cite the actual record. The district court cited the snippet of the record within the defense expert report. That's on page 90 in the appendix. The actual record the defendants cite, which is on 734 and 735 of the appendix, 742, actually has the word maximum, but the next to it doesn't. So it has the maximum hourly, the maximum daily, the maximum every three months. The total at the end is lower than the maximum for three months. It's about half. So they were reporting both. They were reporting both actual emissions and they were reporting maximum. And if I could just give a few more seconds as to the exhibit that we were citing, our expert relied on an exhibit that did not have that maximum qualifier and actually said they were reporting specific emissions. And that is 441 to 443 and 515 in the appendix. All right, Mr. Hawkins. Thank you. You've got some time for rebuttal. Let's see. Mr. Fusco? Thank you, Your Honors. May it please the Court. David Fusco on behalf of Pelleas and I represent Covestro. With me is my colleague, John Ewald, who represents Union Carbide. We'll be dividing our time today. I'll be addressing the standing issue for 10 minutes and Mr. Ewald will be addressing the Daubert Challenge related to Dr. Sahu. Turning to the standing issue, I want to start with a comment that my friend, Mr. Autry, made during his argument in that when he was asked what is the injury, he answered an invasion of a legally protected privacy interest and a current need for medical monitoring under West Virginia law and the basis for the Bower claim. Is it your position that we should adopt a bright-line rule or at least recognize a bright-line rule that in these type of cases, medical monitoring cases, there cannot be an Article III standing representation? No, Your Honor. I do not think this Court need address that issue. I think the issue before the Court is much narrower and it's a question whether Ms. Somerville presented evidence to establish a concrete actual imminent injury under Article III standing, which is different than whether plaintiff could present an injury under West Virginia law and under the Bower elements, which Mr. Autry described. The question is whether there can be an injury under . . . as the federal courts analyze the gatekeeping to get access to an Article III court. That injury, in fact, analysis is a question of federal law. As the United States . . . I'm sorry to interrupt, but it seems like the answer is no. You can't bring a medical monitoring claim under West Virginia law in federal court. Is that right? I don't think that . . . I disagree as broadly as the . . . What I would say, Your Honor, is that under TransUnion, Pentagar, and this Court's decision in Ellingbrook Rocket Mortgage just last week, that the risk of future harm on its own is insufficient to establish Article III standing in a damages claim. And that's what this claim is, is a damages claim. Plaintiffs have pursued consistently from the outset an award of monetary damages to fund a medical monitoring program to remedy their risk of future harm from alleged exposures to ethylene oxide. So what do you say that . . . What do you think the plaintiff would have had to allege in order to meet the standing requirement beyond the need for medical monitoring because of the potential for future harm? What else did they need to say? I think as it relates to an actual damages claim as they've presented here, they would not be able to do that based on risk of future harm. I don't think you answered my question. I'm sorry, Your Honor. What would they have to allege? What would the plaintiff have had to allege in this case in order to satisfy the standing requirements for a medical monitoring claim under West Virginia law? In other words, is there . . . For example, let me ask. If she had alleged that she suffered psychological harm in the form of anxiety and needed treatment for that from a psychologist or a psychiatrist, and then on top of that she needs medical monitoring to deal with those issues and any potential future harm, is that enough? I think if she . . . If the plaintiff were to allege an actual present injury and then were pursuing medical monitoring relief in connection with that injury, the primary injury itself would be the relief addressing that initial injury. No. I think you would concede that the cases that . . . TransUnion and Rocket Mortgage, those did not deal with the issue of toxins or environmental emissions, and the Supreme Court, I don't think, has overruled its cases with respect to those issues. Do you think that TransUnion applies across the board, the issue of standing in all cases? Yes, Your Honor. I think the question of whether risk of future harm can present standing for damages claim is the same, whether it's a data breach case or whether it is an exposure case. When you look back even at the Duke case that appellants cite in their brief, that is purely analogous to injunctive relief, although it is not addressed as such, admittedly, in 1978 when the court addressed it, but it was an issue under the Price-Anderson Act where there was a cap on the compensable damages that could come if there was a nuclear incident, and the plaintiffs were seeking a declaratory judgment because if they had waited until they were injured, it would be uncompensable damages. So it is effectively an injunctive form of relief which then triggers the question of whether the injury is imminent enough under TransUnion, Rocket Mortgage, and the related cases, and that is a different question of whether it is a certainly impending risk of future harm. I'm not understanding your position in terms of standing from Article III. It seems to me there's at least part of it, at least the district court judgment, could be ruled relating to the 702 exclusion of Dr. Sue's testimony. On the one hand, there is the question that I asked earlier, and it seems like Judge Diaz has alluded to it too, the question of, well, can you even show an injury with a medical monitoring-type claim? That's a broader question, and I think you probably rightly said that's not before us. All we need to show is she didn't have an injury, but the district court did alternatively hold that if he went to the merits of it, that she just wasn't sufficiently exposed to it, which to me, am I wrong? That really would come from the excluded testimony, Dr. Sue, to say that she had been exposed at a certain level. So it seems to me we may not even need to deal with it from, at least from your perspective, if you are correct on the exclusion of this expert testimony. It's a question of exposure, which if I heard the other side say, that's injury. It's not necessarily the physical injury. It's exposure to the toxic chemicals that one has an injury, and monitoring it is another element. So you see where I'm going with this? Yes, Your Honor. So the question would be, you've separated out, you're dealing with Article III standing, which to me sort of goes to the whole question of well, is there an injury at all, or can you do it in these cases or not? But to get more specific on this, if you go to where the district court went, and that is there's no, she can't show exposure to it because she doesn't have this expert, which goes back to the 702 exclusion of expert, and it seems these arguments are sort of intertwined. But what are we dealing with here? Maybe it helps me in terms of your answer to Judge Beers' question because I was sort of struck with it too in terms of the way you answered that. So are those alternative arguments, or are they all part of the same? And you can narrow it and say specifically just this case for her. They are intertwined, Your Honor. As you pointed out in footnote A to the district court decision, he noted that he would have granted summary judgment. Let me ask this question because this is helpful too. Do you agree that an injury can be shown by exposure? In other words, one is exposed to a certain level of toxic chemicals, that in itself is an injury. Is that? I disagree not for an Article III damages claim. I disagree, Your Honor. And to answer, go back to your prior question about the nature. But if that's the allegation and the fact that an expert witness hasn't been able to establish even that, then whether you agree or not doesn't matter because there's nothing else that shows an injury. Exactly, Your Honor. I think with the exclusion of Dr. Sahu, it is clear that there is no evidence of exposure. As my friend Mr. Autry mentioned in his argument, that they needed expert testimony to establish their case to prove both causation and damages. I'm just going to be candid because quite fundamental to me, someone who is exposed to a toxin at a certain level that you know is harmful and you're exposed to it continuously. It's not like smoking a cigarette. Maybe that would be it, but I'm not good at those cases at all. But it would seem like that could be possibly an injury. But you've got to at least show they've been exposed. And so the district court says she can't show exposure in this case and certainly not without this expert. So I'm just trying to put your argument in a way in which without having . . . How narrow can we be in this decision, this website? And I agree with you, Your Honor. I disagree. I do believe that the exposure, even to a chemical that you might think is significantly exposed, I don't think that is enough for injury in fact for a damage claim. But you're absolutely right. We need not get there here because there isn't exposure. Without exposure, she unquestionably cannot establish Article III standing. That's the same reason that Judge Goodwin stated in footnote 8 that he would have granted summary judgment because without exposure, they can't prove without the significant exposure they required in .1, the first element of Bauer. They couldn't prove that claim. And does that come from the failure to not being able to have the expert in? The lack of an exposure is because their expert on exposure was excluded, yes.  If I understood your question correctly. Can I ask a procedural question? The case ultimately was dismissed on standing grounds. So that means that the plaintiffs wouldn't be barred from pursuing the claim in state court? Is that right? No. If they were dismissed on Article III standing, would simply dismiss it from the federal forum. They'd be left to do what they see fit with it. Otherwise, the question of whether they're standing in the state forum would be up to the state court. Right. Okay. Thank you. Thank you, Your Honor. Your Honor. Thank you. Thank you, Your Honor. May it please the court, as Mr. Fusco indicated, I'm going to be focusing on that expert exclusion issue of Dr. Sahu. And as my friend indicated across the aisle, their only exposure evidence was Dr. Sahu. He was excluded. The district court's analysis was the analysis this court called for in Nice and in Sardis, where those district courts, they did not actually follow Rule 702 and sufficient facts or data, which is a standard that is not mentioned at all in either of plaintiff's briefs to this court. And I'll start with, Your Honor, Judge Diaz's question about the 1985 omissions documents, maximum potential omissions.  And we talk about this in our brief on page 28, 29, and we have a number of joint appendix sites. And what you see, Judge Goodwin. Is that the one dealing with the Institute, the question of whether or not it came from the Institute or came from that? That's not it. No, Your Honor. There's a lot of parts. It looks like there was a 1985 something that dealt with this. Yeah. Yeah. And I can get to that next if you like. Oh, you go. But this one was what Judge Diaz, I believe, was saying, is that there is a regulatory standard, Reg 27, the West Virginia State Code, that says in order to get registration, you have to provide the maximum potential omissions. So that is the regulatory standard. There's no dispute about that. And Dr. Sahu admitted at his deposition to me that he wasn't familiar with those standards because it's not something he had looked at. And if you look at the face of the documents, we quote from some of them, so does Judge Goodwin, it is clear as day that these are maximum potential omissions. And so, yes, Dr. Sahu says in an Ipsy-Dixit format of, that's not the way I read it. But if you look at this court's decision, for example, in Nice, where you have an automobile accident, and part of it relates to a 1987 internal document from the manufacturer, the plaintiff expert says that document proves the design defect because it shows they should have done something else with the design. And what this court did is it walks through the document itself, the testimony from defendants, experts, and fact witnesses, and it indicates it's very clear on the face of the document this is referring to a different type of car. And it's not reasonable, it's not reliable for the plaintiff expert to do that. And it's the same kind of thing with the Sardi's case, where that involved an ASTM provision about whether or not that provision involved in a wooden box that broke, whether it applied to a corrugated cardboard box, right? So let me, because this is what's troubling me on this. The doctor, is it Sahu? Yes. Sahu uses the data based upon Union Carbis' filings to regulatory agencies over a period of 29 years or so, I guess, and the district court's problem was that Dr. Sahu did not validate that information. In other words, the very information that Union Carbis applied to the regulatory agencies, all well and good. But I'm just wondering, how could he validate it? I mean, this is information coming from the company going to come to regulatory agencies he's using, and it has, you know, some of it's maximum, some minimum. You don't know. Maybe some of it's all collaborated, the whole bit. But that's what they're sending to them, and you know they are putting something out there. And I'm, the validation part about it, and this is where that little commentary to the rules started getting into some courts. There's weight, not admissibility. Right. And we're clear it's admissibility. I got that.  But why, that's confusing, you know, because then it subjects it to all the scientific principles of falsification, validation, reliability, the method that was used, and how do you determine that? And yet, this is the data that was supplied by Union Carbide to regulatory agencies. It would seem like to me a regulatory agency would have wanted to know that, but they didn't have to do that. Well, a couple of responses, Your Honor. The first one is, there was testimony in the record that the purpose for which these regulatory filings are made are not for historical reconstruction, right? They're not for the same purpose that what Dr. Sahu is doing here. On pages 23 and 24 of our brief, we lay out specifically, Dr. Sahu said his goal, I mean, his goal, his charge, was to historically reconstruct emissions. And he said an important part, this is on page 24 of our brief, JA226, an important part of his role in this case to determine whether the data presented is in fact valid and appropriate for its used purpose. And so it's that point of, it's valid to go to the regulators, is it being valid for the purpose that he's using it? I'll just use the example given by the 1984 documents. That is also something where it was 1984, there's, as you can imagine, is the infancy of reporting environmental emissions. And so in 1984, there's a report, UCC says, we don't necessarily trust these, we're doing some testing, and we'll get back to you, we think these overstate emissions dramatically. And the follow-up report, he said there was no data. In the record, there is a fugitive emission study that shows that it's much, much lower. What was the purpose of use of Union Carbide supplying that data to the regulatory? What is, what was it, is the purpose? Yes, and it may, it probably does vary a little bit over time. 1984, again, that was very early days, and they were trying to just get a sense generally of what is being put into the atmosphere. Talk about 29 years as it goes, because it's not just 84, it goes 29 years. Absolutely, Your Honor, absolutely. What was the purpose? The purpose is to understand what is being emitted into the atmosphere at a general level. Why? Why? In order to identify control, whether controls, proper controls are in place. There's also separate, later on and more recently, a separate goal of trying to... But the reason you want to know why is because you want to know what's in the air, because it's harmful to you, right? Yes. That's the point I'm getting at. You said the purpose is to emit it. Absolutely. But really, you want to know how much you put in the air, because that stuff is bad for you. So they send this data to the regulatory agency, and the complaint when you take this data over a 29 years is you haven't validated how much, you know, was put in the air or whatever. What good was it to the agency? That's where the law said it. Why give the agency something that's not of any value? Well, it is a value to them for their purpose. They are not trying to historically reconstruct what happened over a 36-year period. Even if you don't historically reconstruct it, you want to at least know for that year what it was. Yes. And that's what I'm asking. So aggregating the years, you just got individual. They're not looking to see over time what it is, which is your medical monitoring situation, but it's dealing just with that time period. So what is the value of telling an agency something for which can't be or isn't validated or reliable? First of all, we are not saying that it is not reliable on a broad scale for this purpose, right? So let me give one example, and that goes to the source parameters. So that was an argument that plaintiffs did not address in their brief, and what Dr. Asahu talks about in his report and in his deposition is that it's really important to be able to reconstruct source parameters. You're talking about where it comes from, actually.  But Union Compound is reporting what it is putting in, or is it just telling you what's in the air? So, for example, the TRI reporting, the one that goes to the EPA, that just has stuff that's coming out of stacks, and then it has stuff that's coming out kind of fugitive, not out of a particular stack, right? And so Dr. Asahu then takes that information and he needs to apply it to his model. And a crucial part of that model, and Dr. Asahu agrees with this, is that you are accurately modeling the different sources, right? Because it matters whether the source is really, really high or really, really low, and what type of emission. And what Dr. Asahu did is he made a lot of assumptions. He took a 2019 work done by the West Virginia Department of Environmental Protection, and he said, I'm going to use that source characterization going back 36 years, even though I know that the historical operations were not static. And he made various assumptions about how it would have changed over time using not what actually was there. And he had that information available to him. And the crucial point... So he's a thin line. I know what the commentary says on it. But what you are giving is there are some serious problems with Dr. Asahu's methods because he didn't do this and he didn't do that. It seems to me your expert then gets up and says, oh, he didn't do this and do that, and then, use that word again, it sounds like to me it goes to the jury. It's a weight thing to me. Because there is a part of the rule that indicates you can't just pick out things, one, two things that the expert didn't do. And it actually gives an example like that, too, which kind of confuses me. But it seems that where you're going is, okay, this could be this, this could be that, but then you put an expert on who cleans it up and says, oh, you've got problems here, problems here. That sounds like to me a jury gets to decide, okay, is that deficient or is it really an admissibility problem? May I answer, Your Honor? Yes. So the answer to the question is that is not ñ there's no battle of the experts here. And we talked about Mr. Machado. The court cites in the footnote 4, I believe, saying that he is not relying on Mr. Machado. Because he knows you didn't get there. We didn't get there. Because you probably had an expert. We did, and we did. And he pointed out some of the problems. But ultimately, and this is what Nice and Sardis in particular talk about, is that Dr. Sahu is making assumptions, right? What emissions data should Dr. Sahu use? Because he's using the data that's reported, I guess, to the government, the data that you've given. But what emissions data should he have used to validate? Yes. Well, there's the emissions data itself that's reported. And then what I'm talking about right now are the source parameters, right? Again, the individual different sources of where the emissions come from. He had that information available to him. He made certain assumptions. And he said, importantly, and the district court talked about this time and again, is the Ipsy Dixit. It wouldn't make a difference. If you did X, if you did Y, it wouldn't make a difference. But he didn't do any testing to confirm that. He just said it. And in a situation where, and we talked about this in our brief, the increased risk, after all of this together, the increased risk is one hundredth of one percent. That's what plaintiffs allege. Those are fine margins. And Dr. Sahu did not do anything to actually confirm that his opinions were accurate. Can I follow up on Judge Winn's question and sort of ask a broader question? There's sort of a balancing here between the judge's obligation, the district court's obligation to ensure a sufficiently reliable foundation for expert testimony, and then the jury's ultimate decision when it comes to any witness, including experts as to whom they choose to credit. How much reliability is enough in a case like this? Because Judge Winn's point is, well, you've got these problems, but ultimately, the jury can make that call. How much work does the district court have to do before saying, I've done enough, and it goes to a jury? Do you think the district court overstepped its bounds here? I do not think the district court overstepped its bounds. Again, looking at Neis and looking at Sardis, for example, we haven't talked about it today, the background. As part of their burden, they had to demonstrate a reliable background. What the district court found is that the plaintiff's expert uses, Dr. Sahu, uses a statement from EPA where EPA says, this is not background. EPA says you can only use it for the year at issue, and it's a nationwide figure. But wouldn't all of that, just some follow-up to Judge Winn's question, wouldn't all of that go before the jury? That this all goes . . . Because even Daubert says, we're not to look at, the district court's not to look at shaky data, that is something that you all would have an opportunity to cross-examine the expert on during trial. Yes. In this instance, it goes to sufficient facts and data under Rule 702. Again, going back to Neis, you have the plaintiff's expert saying, this internal document, in my expertise, shows that there's a design defect. This court, based in part on record evidence from the defense side, said, that's just not what it says, and it's not what it applies, and that is not a sufficient basis. It's a line that can be hard to draw, but I don't think it's particularly close here. One more question. Okay, go ahead. Because, I guess I'm concerned. I'm not sure. I think Judge Winn asked a question earlier. How is Dr. Sahu to validate the data? I'm not sure if we ever got an answer on that, because that's what the district court said. He can't validate the data, which may be for the jury to do, but . . . I think, first of all, again, he did say that that was part of his role, right? He admitted that. How to validate depends on the circumstance. If you're talking about the 1984 data, that was a very crude estimation, and then what you have is testing that shows that that crude estimation was wildly overstated. That's one area which he could have looked at. He was aware of it. I think he said that he didn't think it was overstated. Okay. That would be a difference in opinion between the experts, right? Then you have a situation where, for example, on the source parameter, again, this covers the entire period, and he assumed that it was the same, even though he knew it wasn't the same historical set of different factors. There are plot plans. There is data provided to regulators that he could have determined whether or not the way he was making assumptions was actually borne out by the data, borne out by running the different test methods to see if it made a difference. Instead, he took the easier way out and just said, it wouldn't make a difference in my professional expert judgment. Thank you very much.  Mr. Autry. Thank you, Your Honors. I'd like to start with the question of how much is enough. Well, the standard under Rule 702 with the amendments is more likely than not. Is it more likely than not that doctor saw whose opinion is based on sufficient facts and data? The district court applied a very different standard. Twice, the district court said the standard is whether the expert used, quote . . . I'm sorry to interrupt you, but I don't disagree with that, but then you have to layer on top of that our standard of review, which is for abuse of discretion, which is fairly wide ranging. Why isn't the argument as well? The judge could have admitted this evidence. He chose not to. It's not an abuse. Well, applying the wrong standard is always an abuse of discretion, and the district court said the standard is, quote, an excruciating attention to detail, end quote, by the expert, and that the expert must, quote, wring out all error, end quote. Twice. Where does he say that? He says it on pages 21 and again on 45. So at the beginning and the end of the court's Dalbert analysis, the court applies an incorrect standard that goes against what the Dalbert standard was before and after the 702 amendments. The district court said that the expert needs to validate. This was repeatedly stated throughout the district court's opinion. That is not a standard that this court has ever required, and that is not a standard that the Supreme Court has ever required. It's going above and beyond, and it is especially important here where the district court is saying that you cannot rely on the defendant's representations. So if I am involved in a car accident and I tell the police officer I was going up to 80 and then the plaintiff's expert does an accident reconstruction that says 80 miles per hour would cause such and such stopping distance and that would be dangerous under the circumstances, I would not be able to Dalbert that expert and say, well, I said I was going up to 80, Your Honor. I don't actually know. And here it's more than that because we have an expert that looked at their data where they said they were reporting actual emissions. So we are looking at two different records. The defendants are talking about a record that uses the word maximum, and our expert is talking about a record that does not use the word maximum and uses the term TAP processes and the actual emissions. And if you look at the records, which again are on their experts, 734 to 735, and their snippet of that, page 90 in the appendix, and our expert, 441 to 443 and 515 of the appendix, you'll see that we're talking about two different records. And the district court just chose to go with one set of records and say that the other is unreliable. And here the district court just repeatedly went beyond the gatekeeping role that the Supreme Court has set up. And you can use their data, and this is what the DEP for West Virginia did. So if you look at 570 in the appendix, Dr. Sahu says that this data is reported to the DEP for the purpose of estimating emissions. It is important. They're trying to determine the danger to the community. They're trying to determine the danger to the plaintiff here. And they're saying, well, we just reported more than we had to. That is their representation, and they can take that to a jury. But the evidence supports, more likely than not, that there's sufficient facts and data for Dr. Sahu to rely on that data based upon his reasons. And another reason that Dr. Sahu gave was, if you're just going with the maximum, you're not going to see the same amount of variability from year to year that he was seeing in the records. Their records actually supported, not that they were going with the maximum possible processes, but they were going with actual emissions, and they were reporting what he said they were, which is why you see the variation from year to year. Beyond that, they're relying on a letter, it's page 649 in the appendix, by another company, and they're relying on this as the regulatory standard. This is Roll and Palink, a different company, that said, and it's cc'd UCC, and it's an interoffice memo, and the district court relied on this, by another company that might not even be admissible here, say, in court. But this other company said, we think we're required to report the maximum. You should too. That is the evidence that they are relying on to say that the regulations require the maximum and only the maximum. It's not a letter or a memo from UCC. There's no evidence in the record that says UCC was only reporting the maximum. They're relying on a letter from another company telling UCC this is what we think you should do. Dr. Sahu reliably applied the records to the facts and did not credit that based upon what he saw in the record of what UCC was actually doing on the ground level. Towards the end of the argument, the appellee said that you can't rely on the national data by the EPA. I think this is important because the district court credited the limitations on the national data by the EPA but disregarded the similar limitations on the data by the West Virginia DEP. And if I could have 20 seconds. Go ahead. Thank you, Your Honor. The West Virginia DEP, which is the data the district court said should have been used for background, had four total days of monitoring. Four total. Three at one site, one at another site. And the DEP says on page 1786 in the appendix, you should not use this for extrapolation or predicting background because it is four 24-hour periods total. Dr. Sahu reasonably looked at the two options here and went with the national data, which is a larger data source. Thank you very much, Mr. Sahu. I want to thank both counsel for their fine arguments this morning. We'll come down and greet you and adjourn for the day.
judges: Albert Diaz, James Andrew Wynn, DeAndrea Gist Benjamin